THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MARK KENNEDY, Defendant-Appellant.

First District (6th Division)    No. 1—00—4061

Opinion filed December 20, 2002.

Michael J. Pelletier and Christopher W. Buckley, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, Patrick J. Enright, and Susan R. Schierl Sullivan, Assistant State's Attorney, of counsel), for the People.

JUSTICE O'MARA FROSSARD delivered the opinion of the court:

Defendant Mark Kennedy entered an open plea of guilty to first degree murder for the beating death of the victim, D.H., a two-year-old boy. The State sought imposition of the death penalty based on the fact that the victim was under 12 years of age and the murder was accompanied by exceptionally brutal or heinous behavior indicative of

wanton cruelty. Defendant waived a jury for the penalty phase. The State introduced the testimony of Cleo Childs, the victim's father, and Dr. Kalelkar, the medical examiner, in aggravation. Defendant's mitigation included evidence that he had suffered from psychological problems from childhood. Defendant was sentenced to natural life in prison. Defendant appeals contending the evidence fails to support the trial judge's finding that the murder was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty and that, therefore, he should be resentenced or, in the alternative, the trial judge failed to consider mitigating factors and that, therefore, his sentence should be reduced.

## FACTUAL BASIS FOR PLEA OF GUILTY

As the factual basis for defendant's plea of guilty the State presented defendant's court-reported confession. Defendant, who was 26 years old, stated that he lived with Tina Huley and Tina's two-year-old son, D.H., in March 1997. Cleo Childs was the father of the two-year-old. Defendant indicated he would abuse Tina's son because he was jealous of the attention Tina gave her son. Defendant would bite different parts of the boy's body and burn him with a cigarette.

On March 7, 1997, defendant was baby-sitting for Tina's two-year-old son. Tina was at the hospital. Defendant was supposed to get the baby ready for his biological father to pick him up. Defendant went into the room where the baby was sleeping and bit him hard on the foot, noticing "the taste of blood in [his] mouth." The baby woke up and was crying.

Defendant began changing the baby's diaper and bit the baby again, this time on the buttocks. Defendant stated the baby "cried even more." Defendant took the baby, who was "still crying a lot," into the bathroom and sat the baby in the tub. Defendant hit the baby on the back of his head. The defendant stated that the baby's head "lurched forward." Defendant hit the baby "very hard in his face" and watched as the back of the baby's head "hit the back of the tub where it's at a 45 degree angle." Defendant heard a loud thud and stated that the baby was not crying as much as he had been before.

Defendant got in the tub and "picked the boy up from behind his rib cage [and] dropped him on the ledge of the tub to where his stomach hit the ledge." Defendant watched the baby fall forward and hit his head on the tile bathroom floor. The defendant indicated that when the baby hit the floor, he stopped crying. Defendant picked the baby up off the floor and stated the baby's stomach protruded and the baby appeared to be "in and out of consciousness as if he was lifeless." The baby was unable to walk. Defendant described the baby's body to be "just like a bunch of living tissue that can't move."

Defendant explained that he felt "very, very jealous" of the baby and the attention Tina gave the baby. By injuring the baby, defendant indicated, "As in the past when I had done these stupid things to him, in its own time Tina did show some attention after all these things that I—that I did to this child." Cleo Childs, the baby's biological father, arrived, and after giving the baby to Childs, the defendant went to the bedroom and fell asleep.

Dr. Kalelkar, the medical examiner, would have testified that an autopsy on the baby revealed various internal injuries, including a ruptured intestine and 40 sites showing evidence of old and new injuries, including abrasions, cuts, bite marks, and burns. The two-year-old baby died of peritonitis due to the rupture of his small intestine and abdomen. Manner of death was homicide. The trial court found a sufficient factual basis for the defendant's plea of guilty and entered a finding of guilty to first degree murder.

## SENTENCING HEARING

The State sought the death penalty and defendant waived a jury for both phases of the capital sentencing hearing. Regarding defendant's eligibility, the State introduced defendant's birth certificate, indicating defendant was over 18 years of age at the time of the murder. The State introduced the victim's birth certificate, indicating the baby was two years of age at the time he was murdered. Both the State and defense stipulated that the testimony stated for the record in support of the factual basis for the guilty plea would be reintroduced for the sentencing hearing. The trial court found defendant to be statutorily eligible for imposition of the death penalty because the victim, D.H., was under the age of 12 and the offense was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty. 720 ILCS 5/9—1(b)(7) (West 1998). The trial court proceeded to the aggravation and mitigation phase of the death penalty hearing. The State introduced the testimony of Cleo Childs, the victim's biological father, and the live testimony of the medical examiner in aggravation.

Childs testified he picked up the baby from defendant at Tina's apartment on March 7, 1997. The baby was vomiting and Childs noticed a mark under the baby's chin, but he did not notice any other sign of injury. The baby seemed to be a little sick during the night. The next morning, Childs took the baby to a clinic, then to a hospital, where he was told the baby had died. His son's death hurt him deeply because he can no longer see his son or watch him grow.

Dr. Kalelkar testified that the external examination revealed 16 recent injuries and 20 older injuries. The old injuries included small

scars on the baby's head and chest; scars consistent with healing cigarette burns on his abdomen, chest, back and hand; and bite marks on his arm and thigh. The recent injuries included scratches on the front and back of his body, bite marks on the left foot, cigarette burns on the right and left heel, and two bruises on the forehead.

Dr. Kalelkar indicated her internal examination revealed a ruptured small intestine and lacerated and ruptured mesentery. The pancreas was contused and there was hemorrhaging in the soft tissues around the kidneys. In her opinion, "[A]ll of this was from blunt force to the abdomen." She also noted "a lot of old and healing rib fractures," including four healing rib fractures on the right side and one healing rib fracture on the left side. Dr. Kalelkar also observed "multiple subgaleal hemorrhages," including one in the forehead area, one on the left temporal area, one on the right temporal area, and one on the back under the scalp.

According to Dr. Kalelkar, the victim died "as a result of multiple injuries sustained as a result of blunt trauma" to the abdomen, resulting in a ruptured small intestine. The injuries she observed on the baby "were patterned in the sense this child suffered from injuries on an ongoing basis." The injuries were consistent with the statement given by the defendant.

In the mitigation phase of the death penalty hearing, defense counsel offered the presentence investigation report. He also provided a psychiatric and psychological report prepared by Dr. Carl C. Bell, a professor of clinical psychiatry at the University of Illinois School of Medicine. Defense counsel relied on psychological reports that dated back to 1981. Defendant's criminal history revealed only one misdemeanor conviction for criminal damage to property. Based on the lack of criminal history and the psychological disorders, defense counsel argued against imposition of the death penalty.

The trial court found that defendant was statutorily eligible for the death penalty pursuant to section 9—1(b)(7) of the Criminal Code of 1961, which required that "the murdered individual was under 12 years of age and the death resulted from exceptionally brutal or heinous behavior indicative of wanton cruelty." 720 ILCS 5/9—1(b)(7) (West 1998). However, the trial court found defendant's psychiatric background was a factor sufficient to mitigate imposing the death penalty and sentenced defendant to natural life in prison pursuant to section 5—8—1(a)(1)(c)(ii) of the Unified Code of Corrections. 730 ILCS 5/5—8—1(a)(1)(c)(ii) (West 1998).

## POSTCONVICTION PROCEEDING

The trial court granted the postconviction petition, vacated the

sentence, and ordered a new sentencing hearing because the Illinois Supreme Court found that the statute under which defendant was sentenced, providing for mandatory life imprisonment, violated the single subject rule of the Illinois Constitution. *People v. Wooters*, 188 Ill. 2d 500 (1999). The law that applies to this case provides for discretionary rather than mandatory life imprisonment. 730 ILCS 5/5—8—1(a)(1)(b) (West 1994). The applicable version of section 5—8—1(a)(1)(b) of the Code provides that a trial court may impose a natural life sentence for first degree murder if it finds the murder was accompanied by "exceptionally brutal or heinous behavior indicative of wanton cruelty." 730 ILCS 5/5—8—1(a)(1)(b) (West 1994).

## NEW SENTENCING HEARING

At the new sentencing hearing, the State and defense stipulated to the evidence admitted at the original sentencing hearing. Paul Kennedy, defendant's father and licensed clinical psychologist, also testified in mitigation. He stated that, as a child, defendant was hyperactive and impulsive. Defendant had learning difficulties and minor behavioral problems. At age three defendant began to take Ritalin for attention deficit disorder, which calmed his behavior. Defendant participated in a counseling and treatment program at a local hospital throughout his childhood. He attended St. Rita High School in a special program for learning-disabled students. He scored 85 on IQ tests. His scores in different subjects ranged from two years above age level to four years below age level. Defendant was discharged after 11 weeks from the Navy based on an adjustment disorder. Defendant worked several manual labor jobs and volunteered with various Catholic organizations. He has a positive relationship with his family.

In his statement, defendant acknowledged what he did was wrong but asked for a chance to contribute to society after completing his punishment.

After the new sentencing hearing, the trial court sentenced defendant to natural life in prison based on finding that the murder was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty. 730 ILCS 5/5—8—1(a)(1)(b) (West 1994). The trial court rejected the defendant's motion to reconsider the sentence and defendant appeals.

## ANALYSIS

■ The law in effect that applies to this case provides for discretionary rather than mandatory life imprisonment. 730 ILCS 5/5—8—1(a)(1)(b) (West 1994). Section 5—8—1(a)(1)(b) of the Unified Code of Corrections provides that a trial court may impose a natural

life sentence for first degree murder if it finds the murder was accompanied by "exceptionally brutal or heinous behavior indicative of wanton cruelty" or "that any of the aggravating factors listed in subsection (b) of Section 9—1 of the Criminal Code of 1961 are present." 730 ILCS 5/5—8—1(a)(1)(b) (West 1994).

Section 9—1(b)(7) of the Criminal Code of 1961 provides that a defendant found guilty of first degree murder may be sentenced to death if he was at least 18 years old at the time of the murder, the victim was under 12 years old, and the death resulted from "exceptionally brutal or heinous behavior indicative of wanton cruelty." 720 ILCS 5/9—1(b)(7) (West 1998). The factor relied upon by the trial court in imposing the discretionary life sentence was that the murder of the two-year-old victim was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty. See 730 ILCS 5/5—8—1(a)(1)(b) (West 1994). Mindful of the statutory sentencing provisions that apply to this case, we address defendant's challenge to the trial court's finding that this offense was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty.

## EXCEPTIONALLY BRUTAL OR HEINOUS BEHAVIOR INDICATIVE OF WANTON CRUELTY

■ In reviewing whether the trial judge properly found that defendant's behavior was exceptionally brutal or heinous indicative of wanton cruelty and, therefore, rendered him eligible for a life sentence, we apply an abuse of discretion standard. *People v. Andrews*, 132 Ill. 2d 451, 464 (1989).

■ Behavior is "heinous" if it is hatefully or shockingly evil, grossly bad, or enormously and flagrantly criminal. *People v. La Pointe*, 88 Ill. 2d 482, 501 (1981). Behavior is "brutal" if it is grossly ruthless, devoid of mercy or compassion, or cruel and cold-blooded. *La Pointe*, 88 Ill. 2d at 501. Behavior may qualify as exceptionally brutal or heinous indicative of wanton cruelty regardless of whether it involves the infliction of torture or unnecessary pain. *La Pointe*, 88 Ill. 2d at 501.

When assessing the brutality and heinousness of a crime, we must evaluate all of the facts surrounding the offense. *People v. Hartzol*, 222 Ill. App. 3d 631, 651 (1991). Various factors indicate behavior was exceptionally brutal or heinous, including premeditation, the unprovoked nature of the attack, the "senseless" nature of the act, the number of wounds inflicted, the danger created by the act, and the extent of the injury inflicted. *Hartzol*, 222 Ill. App. 3d at 652. We are mindful that where there is evidence of previous abuse of the victim, we have held that, in considering the propriety of a sentence based on

a finding of exceptionally brutal or heinous conduct, prior acts of abuse cannot be used unless the prior acts caused the death or were inflicted contemporaneously with the death. *People v. Rodriguez*, 275 Ill. App. 3d 274, 290 (1995).

Defendant relies upon *Rodriguez*, 275 Ill. App. 3d at 290, to support his argument that his behavior was not exceptionally brutal or heinous indicative of wanton cruelty. In *Rodriguez*, the two-year-old victim died nearly instantly from internal bleeding after the defendant struck the victim's abdomen three times with his hand. The *Rodriguez* court found the victim did not suffer the "slow, extended, and extremely painful process" to constitute exceptionally brutal or heinous behavior by the defendant. *Rodriguez*, 275 Ill. App. 3d at 290.

The instant case is unlike *Rodriguez* because the victim in this case did not die immediately but lived for approximately 24 hours after defendant abused him over a period of time during the evening of March 7, 1997. Defendant in his statement admitted the following: (1) he bit the child on the foot hard enough to break the skin and defendant could taste blood; (2) he bit the child on the buttock; (3) he hit the child on the head while in the bathtub and stated "it lurched forward"; (4) he hit the child so hard that the child did not cry as much; and (5) he picked the child up and dropped him over the ledge of the tub so that the child's abdomen hit the ledge, then the child hit the ground and injured his head on the tile.

Dr. Kalelkar found 16 recent external injuries to the victim including two bruises to the forehead, a cigarette burn to the right heel, bite marks on the left foot and sole of the foot, as well as scratches on the front and back of the victim. Regarding internal injuries, the autopsy revealed a ruptured intestine, ruptured mesentery, contused pancreas, and hemorrhage in the soft tissue around the kidney. These injuries were caused by blunt force trauma to the victim's abdomen, which caused the small intestine to rupture. The ruptured intestines caused peritonitis due to the blood and fecal matter pouring in the abdominal cavity of the victim. Unlike the immediate death in *Rodriguez*, in the instant case, the victim died approximately 24 hours after he sustained these injuries.

In evaluating the brutality and heinousness of the crime, the "entire spectrum of facts surrounding the given incident must be analyzed and evaluated." *People v. McGee*, 121 Ill. App. 3d 1086, 1089 (1984). Courts have properly considered various factors in determining whether behavior was exceptionally brutal or heinous indicative of wanton cruelty, including the following: the unprovoked and senseless nature of the attack (*McGee*, 121 Ill. App. 3d at 1091); the number of wounds inflicted (*People v. Devine*, 98 Ill. App. 3d 914, 925 (1981)); the

extent of the injury inflicted (*Hartzol*, 222 Ill. App. 3d at 652); use of a series of actions to terrorize and endanger the victim (*People v. Viens*, 109 Ill. App. 3d 1017, 1028 (1982)); conduct devoid of mercy or compassion (*La Pointe*, 88 Ill. 2d at 501); the amount of force used, including wholly gratuitous violence (*People v. Ratzke*, 253 Ill. App. 3d 1054, 1071 (1993)); and the mental anguish of the victim (*People v. Clark*, 102 Ill. App. 3d 414, 426 (1981)).

■ We find the experienced trial judge properly used his discretion in evaluating and analyzing the entire spectrum of facts surrounding the murder of the two-year-old victim. The life sentence imposed for this crime is not an abuse of discretion but is supported by a variety of factors including, but not limited to, the unprovoked and senseless nature of the attack, the number of wounds inflicted, the extent of the injury inflicted, the prolonged nature of the offense, conduct devoid of mercy or compassion, the amount of force used, and the repeated gratuitous violence.

For the reasons previously discussed, we cannot conclude that the trial court abused its discretion by finding defendant's behavior exceptionally brutal or heinous indicative of wanton cruelty.

## TRIAL COURT PROPERLY CONSIDERED MITIGATING FACTORS

■ A trial court's sentencing determination must be based on the particular circumstances of each case, including factors such as the defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age. *People v. Fern*, 189 Ill. 2d 48, 53 (1999); *People v. Perruquet*, 68 Ill. 2d 149, 154 (1977). Generally, the trial court is in a better position than a court of review to determine an appropriate sentence based upon the particular facts and circumstances of each individual case. *Perruquet*, 68 Ill. 2d at 154. Thus, the trial court is the proper forum for the determination of a defendant's sentence, and the trial court's decisions in regard to sentencing are entitled to great deference and weight. *Perruquet*, 68 Ill. 2d at 154. Absent an abuse of discretion by the trial court, a sentence may not be altered upon review. *Perruquet*, 68 Ill. 2d at 154. If the sentence imposed is within the statutory range, it will not be deemed excessive unless it is greatly at variance with the spirit and purpose of the law or is manifestly disproportionate to the nature of the offense. *Fern*, 189 Ill. 2d at 54.

■ The record demonstrates that the trial court was fully aware of the circumstances of the crime, defendant's limited criminal history, and defendant's psychological history. The defendant had developmental disabilities and psychological problems. Defendant's father was a

clinical psychologist and made sure defendant received medication and therapy throughout his childhood and adolescence. Defendant graduated from high school. Defendant had a limited criminal background. He pleaded guilty to misdemeanor criminal damage to property and successfully completed his sentence of one year's conditional discharge, including 60 hours of community service and restitution. The record reflects that the trial court considered all factors in mitigation and aggravation and sentenced defendant within the statutory range. The trial court did not abuse its discretion in sentencing defendant and the life sentence was not excessive.

We are mindful that our supreme court recently held in *People v. Swift*, 202 Ill. 2d 378, 392 (2002), that for purposes of *Apprendi* analysis, the sentencing range for first degree murder is 20 to 60 years' imprisonment, and that any sentence greater than 60 years requires additional factual findings which must be proven beyond a reasonable doubt. *Swift*, 202 Ill. 2d at 392. Specifically, the court in *Swift* indicated as follows:

> "We conclude that for purposes of *Apprendi* analysis, the 'sentencing range' for first degree murder in Illinois is 20 to 60 years' imprisonment. This is the only range of sentence permissible based on an ordinary jury verdict of guilt. Although there is statutory authorization for higher sentences to be imposed for this crime, any sentence longer than 60 years requires additional factual findings. See 730 ILCS 5/5—8—2(a) (West 1998) (extended-term sentence); 730 ILCS 5/5—8—1(a)(1)(b), (a)(1)(c) (West 1998) (life imprisonment); 720 ILCS 5/9—1(g), (h) (West 1998) (death penalty). According to *Apprendi*, any factual findings which take a sentence above the sentencing range must be proven to a jury beyond a reasonable doubt. In this case, the factual finding that defendant's crime was brutal and heinous was made by the circuit court, and the State was not held to the appropriate burden of proof. Accordingly, defendant's sentence cannot stand." *Swift*, 202 Ill. 2d at 392.

In *Swift*, unlike the instant case, the defendant did not plead guilty, but was convicted after a jury trial. Moreover, unlike the instant case, the State in *Swift* did not seek the death penalty, but requested an extended-term sentence. The court in *Swift* found the offense was exceptionally brutal or heinous and imposed an extended-term sentence of 80 years' imprisonment based on that finding. 730 ILCS 5/5—8—2(a), 5—5—3.2(b)(2) (West 1998).

In the instant case, the State sought the death penalty, and defendant pleaded guilty and waived a jury on both phases of the death penalty hearing. The trial judge found defendant eligible for the death penalty based on the aggravating factor designated in section

9—1(b)(7) of the Criminal Code. Under section 9—1(b)(7), the trial judge found defendant eligible for the death penalty because the victim, D.H., was under 12 years of age, and his death resulted from exceptionally brutal and heinous behavior indicative of wanton cruelty. 720 ILCS 5/9—1(b)(7) (West 1998). The section 9—1(b)(7) aggravating factor was required to be proved by the State beyond a reasonable doubt regardless of whether the proceedings took place before a jury or before the trial judge without a jury. 720 ILCS 5/9—1(f) (West 1998). Defendant waived his right to have a jury determine whether the section 9—1(b)(7) factor had been proved beyond a reasonable doubt, and following the jury waiver, the trial judge found that the State proved the aggravating factor necessary for the imposition of any penalty up to and including death. Rather than imposing a death sentence, the judge sentenced defendant to natural life in prison based on the same aggravating factor on which the finding of death eligibility was predicated and proved by the State beyond a reasonable doubt; therefore, no *Apprendi* violation occurred. See *People v. Tye*, 323 Ill. App. 3d 872 (2001).

Moreover, we note that *Apprendi*-based sentencing objections cannot be heard on appeal from a guilty plea. *People v. Jackson*, 199 Ill. 2d 286, 295 (2002). In the context of this case, the life sentence was imposed after the State proved the aggravating factor beyond a reasonable doubt. Thus, we find the sentence in this case raises no *Apprendi* concerns.

## CONCLUSION

For the reasons previously discussed, we affirm the judgment and sentence of the circuit court. Defendant was convicted under count II and his mittimus should be corrected to reflect conviction under section 9—1(a)(2) of the Criminal Code of 1961. 720 ILCS 5/9—1(a)(2) (West 1996).

Affirmed.

O'BRIEN, P.J., and GALLAGHER, J., concur.