THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. OTIS DOUGLAS, Defendant-Appellant.

First District (5th Division)   No. 1—03—2564

Opinion filed October 21, 2005.

Michael J. Pelletier and J. Michael True, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, Alan J. Spellberg, and Jessica J. Lechter, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE GALLAGHER delivered the opinion of the court:

Following a jury trial, defendant Otis Douglas was convicted of home invasion and of the first degree murder of Michael Carter. The trial court imposed an extended-term sentence of 70 years for the murder and a consecutive 30-year term for the home invasion. On appeal, defendant challenges the effectiveness of his trial counsel, contending that his attorneys failed to object to hearsay evidence and did not request an instruction on concealment of a homicide even though counsel conceded that defendant concealed Carter's death. Defendant also raises several arguments regarding his extended-term sentence, which was imposed based on the jury's finding that the killing was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty and the trial court's consideration of various factors. For the reasons that follow, we affirm defendant's convictions and sentence.

Defendant was charged with first degree murder, home invasion and concealment of a homicidal death. Before trial, the State dismissed the concealment count via a *nolle prosequi* and tried defendant on the remaining two offenses.

The testimony presented at trial revealed a love triangle among Carter, defendant and Donna Lindo. Lindo testified that she and Carter began dating in the early 1990s and that they lived together. When Carter moved to Maryland in February 1999, they maintained a long-distance dating relationship. Later in 1999, Lindo met defendant

at a club, and they began dating. Lindo testified that shortly thereafter, she told defendant about her romantic relationship with Carter. Defendant told Lindo that he lived with another woman and their child but that his relationship with the woman was not good.

Lindo stated that Carter visited her in November 1999 and stayed for two weeks. Meanwhile, Lindo and defendant began to see each other three times a week, with defendant spending the night at Lindo's townhouse in Des Plaines. However, Carter was planning to return to Illinois from Maryland and wanted to live with Lindo. Lindo testified that when defendant told her he wanted to move in with her, she said he could not because her boyfriend was "coming home." Lindo said defendant "seemed upset" at that news. Defendant told Lindo he wanted to continue their relationship after Carter moved in, and Lindo refused.

However, defendant spent the night at Lindo's residence on February 14, 2000. The next day, Lindo told defendant that Carter would be visiting her that week and asked defendant not to call her or come to her townhouse during Carter's visit. Lindo testified that she communicated with defendant solely via his cellular phone and did not know his last name or home address.

Lindo expected Carter to arrive on the morning of February 17, 2000, and she stayed home from work that morning to wait for him and also to await a furniture delivery. When Lindo left for work at 10 a.m. after the furniture was delivered, Carter had not yet arrived. Lindo testified that on her way to work, she called defendant and they had a "casual conversation" about her new furniture.

Carter called Lindo between noon and 12:30 p.m. to tell her he had arrived at her townhouse and was watching TV and eating crackers in the basement. Carter called Lindo a second time and told her someone had been calling the townhouse and hanging up when he answered. Lindo suggested that Carter check the caller ID to determine the origin of the calls. Carter did and said the caller's number was blocked. Lindo called defendant and asked if he had been calling her home and hanging up. Defendant said he was not.

Lindo testified that at about 1:30 p.m., she spoke to Carter for a third and final time. During their conversation, another call came through via call waiting. Carter switched to the other call and then returned to Lindo and told her the phone was "messing up." At that point, their call was disconnected. Lindo's repeated calls to her home were unanswered.

Between 3:30 and 4 p.m., Lindo's son called Lindo as he customarily did when he returned home from school. Lindo asked him to see if Carter was in the basement. Lindo's son told her no one was in the

basement and that "red stuff" was on the floor and some speakers had been overturned. Lindo returned home to find splashes of blood on the walls of her basement laundry room and clothing on the floor. A handwritten note left on Lindo's bed upstairs stated: "Bicth [*sic*], when I come back I'm going to kill you." A jacket and luggage also were found in Lindo's bedroom; those items were later identified by Carter's mother as belonging to her son.

Des Plaines police and evidence technicians testified that blood was found on the floor of the laundry room and throughout the room, including in the utility sink. A plate of crackers was found on the floor of the basement near the laundry room. Footprints led from the laundry room to Lindo's bedroom, where the threatening note was found.

The testimony of Izette Curtis and Wilton Jackson, two acquaintances of defendant, established that defendant borrowed a car from them on February 17 and that he was carrying an ax. Curtis and Jackson later found bloodstains on a tool found in the car's trunk. In a search of defendant's residence on February 18, police recovered a pair of jeans with bloodstains and DNA that matched Carter.

Lindo had testified that defendant drove a white Lexus. Salvador Avalos, who lived in the townhouse next to Lindo's, testified that he saw a white Lexus parked near Lindo's unit at about 2:30 p.m. on February 17. On prior occasions, Avalos had seen defendant in the Lexus; Avalos later identified defendant in a police lineup. A second witness testified to seeing a white Lexus in the townhouses' parking lot between 2 and 4 p.m. Donald Donerson, a neighbor of defendant, testified that he saw defendant washing his car with a hose and cleaning out the trunk between 3:40 and 4 p.m. on February 17.

The parties stipulated to defendant's cell phone number and Lindo's home phone number and to record . of phone calls made from and received at those numbers. The parties also stipulated that defendant cancelled his cellular phone account on February 17 and received a new cell phone number.

On February 29, Carter's partially burned body was recovered from an auto body shop. Adrienne Segovia, a deputy Cook County medical examiner, testified that she performed an autopsy on Carter's body, which was headless. The forearms and lower legs had been severed. Stab wounds were present on the chest and back, and Segovia testified that based on evidence of hemorrhaging in the wounds and inhaled blood in the lungs, the stab wounds occurred while Carter was still alive. An ax wound near Carter's spinal cord showed signs of hemorrhaging, which indicated that the wound was inflicted while Carter was alive. Segovia testified that the irregular nature of the

wounds that severed Carter's head and limbs also was consistent with being caused by an ax. The limbs were severed after death. Photographs of Carter's wounds were shown to the jury.

The jury was instructed that if it found defendant guilty of first degree murder, it must then decide whether the murder was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty. The jury convicted defendant of first degree murder and home invasion and also found that Carter's death was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty.

Before sentencing, the trial court heard testimony in aggravation and mitigation. The court sentenced defendant to an extended term of 70 years for the murder and a consecutive 30-year sentence for home invasion. Defendant's motion for reduction or modification of his sentence was denied.

## ANALYSIS

Defendant raises three arguments of ineffectiveness of his trial counsel. Defendant first asserts that Lindo's testimony detailing her telephone conversations with Carter prior to the murder was hearsay and counsel was ineffective in failing to object to its admission. Defendant also argues that his attorney was ineffective in conceding defendant's guilt as to the concealment of Carter's body and failing to request an instruction on that offense. Defendant's third claim of ineffectiveness involves the absence of jury instructions defining "brutal" and "heinous" and outlining the factors to be considered in finding defendant eligible for an extended-term sentence. We initially address defendant's first two ineffective assistance contentions, and we will consider his argument as to the propriety of certain jury instructions and factors pertaining to his extended-term sentence along with his additional challenges to his sentence.

### 1. Defense Counsel's Failure to Object to Lindo's Testimony

Defendant first contends that his trial counsel was ineffective in failing to object to Lindo's testimony about her three telephone conversations with Carter after he arrived at her townhouse. He asserts that the content of those conversations was inadmissible hearsay that discredited the defense's theory that although defendant concealed Carter's body, he did not commit the murder.

To support a claim of ineffective assistance of counsel, a defendant must show that counsel's representation fell below an objective standard of reasonableness and, furthermore, that counsel's actions resulted in prejudice to the defendant. *Strickland v. Washington*, 466 U.S. 668, 687, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064 (1984).

Because a defendant must satisfy both prongs of this test to prove ineffective assistance of counsel, the failure to establish either point is fatal. *Strickland*, 466 U.S. at 697, 80 L. Ed. 2d at 699, 104 S. Ct. at 2069.

■ Hearsay is an out-of-court statement offered to prove the truth of the matter asserted. *People v. Moss*, 205 Ill. 2d 139, 159, 792 N.E.2d 1217, 1229 (2001). When an out-of-court statement is offered for a purpose other than for its truth, the statement is not hearsay and is admissible. *People v. Brandon*, 283 Ill. App. 3d 358, 365, 669 N.E.2d 1253, 1258 (1996). To use the often-cited Wigmore example illustrating hearsay, if witness A testifies that " 'B told me that event X occurred,' " A's testimony would be admissible to establish what B said to A. *Northern Trust Co. v. American Airlines, Inc.*, 142 Ill. App. 3d 21, 37-38, 491 N.E.2d 417, 428 (1985), quoting 6 J. Wigmore, Evidence § 1766, at 250 (Chadbourn rev. 1976). However, A's testimony would not be admissible if it was offered to prove that event X occurred because its probative value would be based on B's knowledge and B would not be present for cross-examination. *Northern Trust*, 142 Ill. App. 3d at 38, 491 N.E.2d at 428, citing 6 J. Wigmore, Evidence § 1766, at 250 (Chadbourn rev. 1976).

Defendant argues that Lindo's testimony was offered for its truth, *i.e.*, to prove that Carter had arrived at Lindo's townhouse and was in the basement, that someone repeatedly called and hung up, and that those phone calls came from a blocked number. The State responds that Lindo's testimony was offered to show that Carter was alive in the afternoon of February 17 (to counter the theory offered by defendant that Lindo killed Carter herself before she went to work) and also to illustrate Lindo's state of mind and subsequent course of conduct that afternoon.

Having considered those assertions and the testimony at issue, we conclude that Lindo's account of her conversations with Carter was offered to establish that Carter spoke to Lindo in the afternoon while Lindo was at her workplace, countering the defense's theory that Carter had been slain that morning. Furthermore, the testimony was offered to show that Lindo spoke to Carter and that he told her of the repeated phone calls and hangups, prompting Lindo to call defendant and ask if he was calling her home.

The State offered independent evidence, in the form of telephone records, to prove that calls were made from defendant's cellular phone to Lindo's home phone at 11:20 a.m., 12:52 p.m. and 1:45 p.m. on February 17. The records of defendant's cellular phone calls indicate that in making those calls, defendant used the *67 feature to block his identifying information from appearing on Lindo's caller ID. The State

also elicited independent testimony to prove Carter's presence at Lindo's residence via his luggage and jacket in the master bedroom.

■ Because Lindo's testimony was not offered for its truth and therefore was not hearsay, defense counsel's failure to object to the admissible testimony did not constitute ineffective assistance. Because defendant has not met the first prong of *Strickland*, we need not consider his contentions that Lindo's account was prejudicial to his case. See *People v. Ceja*, 204 Ill. 2d 332, 358, 789 N.E.2d 1228, 1245 (2003).

### 2. Defense Counsel's Failure to Request Jury Instruction on Concealment of a Homicide

Defendant next contends that his counsel was ineffective in failing to request a jury instruction on concealment of a homicide. He further contends that the absence of that instruction was prejudicial because although counsel maintained that defendant did not kill Carter, counsel conceded that defendant concealed Carter's body. Although defendant acknowledges that conceding guilt to a lesser offense is an acceptable trial strategy, he asserts that because counsel did not request an instruction consistent with his defense, the jury's only option was to convict him of first degree murder.

■ As we noted in considering defendant's first argument on appeal, defendant's claim of ineffectiveness of counsel is defeated if he is unable to prove either that counsel's performance fell below an objective standard of reasonableness or that he was prejudiced as a result. *Strickland*, 466 U.S. at 697, 80 L. Ed. 2d at 699, 104 S. Ct. at 2069.

Although defendant was initially charged with first degree murder and also with concealing Carter's death, the prosecution nol-prossed the concealment count before trial. A State motion for *nolle prosequi* formally indicates that it is unwilling to prosecute the case, and the entry of a *nolle prosequi* in the record dismisses the indictment or charge at issue and terminates all further prosecution. *People v. Daniels*, 187 Ill. 2d 301, 312, 718 N.E.2d 149, 157 (1999). A motion to nol-pros a charge is comparable to a motion to dismiss. *Daniels*, 187 Ill. 2d at 312, 718 N.E.2d at 157.

Defendant concedes that concealment of a homicide is not a lesser-included offense of first degree murder. Nevertheless, he maintains he was entitled to a concealment instruction because much of the evidence offered at trial was not proof of how Carter was killed but, instead, of how Carter's body was concealed. At issue therefore is whether defendant's counsel can be deemed ineffective for failing to request a jury instruction for a charge that was nol-prossed before trial but that remained the focus of the defense's theory.

The Illinois Supreme Court concluded in early opinions that a jury could not be instructed as to an offense other than the crime charged. In *People v. Stanko*, 402 Ill. 558, 561, 84 N.E.2d 839, 841 (1949), the court held that an accurate instruction as to a charged offense did not cure the giving of an instruction defining a different, uncharged crime, since it is impossible to know which instruction the jury followed. Shortly thereafter, in *People v. Thompson*, 406 Ill. 323, 327, 94 N.E.2d 163, 165 (1950), the supreme court relied on *Stanko* in holding that the jury should not have been instructed as to an uncharged offense; however, *Thompson* held that any error was harmless because the jury convicted the defendant of the charged offense and apparently did not take into account the erroneous instruction. More recent appellate court decisions have considered defendants' claims of prejudice from jury instructions on uncharged offenses. See *People v. Harris*, 146 Ill. App. 3d 632, 497 N.E.2d 177 (1986); *People v. Olson*, 128 Ill. App. 3d 560, 563, 470 N.E.2d 1176, 1179 (1984) (noting that "prejudice is the natural result of erroneously instructing the jury on an *uncharged* offense" (emphasis in original)).

Despite defendant's admission that concealment is not a lesser-included offense of first degree murder, he asserts that the jury should have been instructed as to concealment because that charge was contained in the original indictment and is a lesser offense to first degree murder. Defendant is correct that he can be entitled to a jury instruction on a less serious offense if that offense is included in the charged offense. See *People v. Hamilton*, 179 Ill. 2d 319, 323, 688 N.E.2d 1166, 1169 (1997). He argues that one of the murder charges was based on the brutality and the heinous nature of his behavior, which included the removal of Carter's head and limbs and the disposal of Carter's body.

In similar cases, this court has rejected defendants' claims that a concealment instruction was required. In *People v. Becerril*, 307 Ill. App. 3d 518, 527-28, 718 N.E.2d 1025, 1031-32 (1999), the defendant was indicted for first degree murder on an accountability theory, and he asserted that a concealment instruction was warranted. The appellate court disagreed, noting that offense requires: (1) knowledge that a homicidal death has occurred; and (2) an affirmative act of concealment by the defendant. *Becerril*, 307 Ill. App. 3d at 528, 718 N.E.2d at 1032. The court held that the elements of murder with which the defendant was charged did not include the offense of concealment. *Becerril*, 307 Ill. App. 3d at 528, 718 N.E.2d at 1032. See also *People v. Cannon*, 150 Ill. App. 3d 1009, 1020, 502 N.E.2d 345, 352 (1986).

Here, the murder charges based on the brutality of defendant's conduct did not include the element of concealing Carter's body. "Each

offense requires different acts as well as different states of mind; each requires proof of facts that the other does not." *Cannon*, 150 Ill. App. 3d at 1021, 502 N.E.2d at 352. The offense of concealment of a homicidal death requires proof that the defendant concealed the victim's body. We do not find that offense encompassed within the charge that defendant killed Carter and that the murder was accompanied by exceptionally brutal and heinous behavior indicative of wanton cruelty. The brutality of a particular murder is not affected by whether the body was concealed after the fact.

Furthermore, given defendant's concession that concealment is not a lesser-included offense of first degree murder, we find his reliance on *People v. Brocksmith*, 162 Ill. 2d 224, 229, 642 N.E.2d 1230, 1232 (1994), to be misplaced because that case addressed the necessity of a jury instruction on a lesser-included offense. We also find distinguishable the cases that defendant cites in which counsel was found ineffective for failing to offer jury instructions that were consistent with the defense's theory and with the evidence presented. See *People v. Pegram*, 124 Ill. 2d 166, 529 N.E.2d 506 (1988); *People v. Serrano*, 286 Ill. App. 3d 485, 676 N.E.2d 1011 (1997); *People v. Parker*, 260 Ill. App. 3d 942, 632 N.E.2d 214 (1994); *People v. Jaffe*, 145 Ill. App. 3d 840, 493 N.E.2d 600 (1986). Those cases considered the failure of defense counsel to request instructions on affirmative defenses (specifically compulsion, provocation and self-defense), as opposed to lesser, uncharged offenses.

Here, defense counsel was presented with a paradox. Had counsel requested a jury instruction on the concealment charge that the State dismissed prior to trial, defendant would be free to claim on appeal that he did not receive a fair trial because the jury was instructed as to a crime with which he was not charged. See, *e.g.*, *People v. Griffin*, 178 Ill. 2d 65, 687 N.E.2d 820 (1997). In proceeding without a concealment instruction, defense counsel now faces the argument that the failure to request the instruction was ineffective assistance. The elements of concealment of a homicidal death are not contained in the charged offense of first degree murder. See *Becerril*, 307 Ill. App. 3d at 527-28, 718 N.E.2d at 1031-32. Defense counsel did not render ineffective assistance by failing to request a jury instruction on the concealment charge. Therefore, defendant has not met the first prong of *Strickland* on this issue.

### 3. Extended-Term Sentence Based on Finding of Exceptionally Brutal or Heinous Behavior Indicative of Wanton Cruelty

Defendant was sentenced to an extended term of 70 years in prison for first degree murder pursuant to section 5—8—2(a)(1) of the Uni-

fied Code of Corrections (the Code) (730 ILCS 5/5—8—2(a)(1) (West 2002)). That provision allows a judge to impose a sentence of between 60 and 100 years for first degree murder upon a finding of one or more of the aggravating factors enumerated in section 5—5—3.2 of the Code (730 ILCS 5/5—5—3.2 (West 2002)). One of those factors is the commission of a felony accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty. 730 ILCS 5/5—5—3.2(b)(2) (West 2002). Because the jury concluded that Carter's murder met that standard, defendant was eligible for an extended-term sentence.

### a. Definitions of "Brutal," "Heinous" and "Wanton Cruelty"

■ Defendant's first assertions regarding his extended-term sentence involve the absence of jury instructions defining "brutal," "heinous" and "wanton cruelty." He contends that his counsel was ineffective in failing to request that the jury be instructed as to those definitions in considering if Carter's death was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty. Defendant further argues that despite his counsel's decision, the trial judge had an independent duty to instruct the jury on the meaning of those terms. He asks this court to vacate his extended-term sentence and remand his case for resentencing.

The jury was instructed that if it found defendant guilty of first degree murder, it then must determine if the offense was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty. At the jury instructions conference, the State offered an instruction that defined the terms "brutal" and "heinous," using the widely accepted descriptions of "brutal" as cruel, cold-blooded and devoid of mercy or compassion, and "heinous" as enormously and flagrantly criminal, hatefully or shockingly evil or grossly bad.[1] Defense counsel asked that the instruction defining "brutal" and "heinous" not be given.

Defendant argues that without being instructed as to those definitions (and without any definition of "wanton cruelty"), the jury could not have uniformly concluded that his behavior met that standard because each juror's own view of those terms likely varied. The State responds that defense counsel's decision not to instruct the jury on those definitions constituted trial strategy and, given the physical evidence and eyewitness testimony linking defendant to the murder,

---

[1]The State did not offer an instruction on "wanton cruelty," which requires proof that the defendant consciously intended to inflict pain and suffering on the victim. See *People v. Kaczmarek*, 207 Ill. 2d 288, 303, 798 N.E.2d 713, 723 (2003).

his counsel's best tactic was to try to minimize his culpability for the offense and deemphasize the testimony of Carter's injuries. The State contends that defendant's best hope was that jurors would disagree on the definitions of "brutal," "heinous" and "wanton cruelty" and whether defendant's actions fit that description.

Our research has unearthed no cases addressing the specific issue of whether counsel's failure to request jury instructions defining "brutal," "heinous" and "wanton cruelty" automatically renders counsel's performance deficient. This is not surprising, however, since the consideration of the "exceptionally brutal or heinous behavior indicative of wanton cruelty" standard by a jury, as opposed to a judge, is a relatively new development under *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000). While the trial court previously considered whether a defendant's actions met that standard, the United States Supreme Court held in *Apprendi* that, other than the fact of a prior conviction, any factual finding which increases a defendant's sentence beyond the maximum permitted by statute must be proven to a jury beyond a reasonable doubt. *Apprendi*, 530 U.S. at 490, 147 L. Ed. 2d at 455, 120 S. Ct. at 2362-63; see also *People v. Swift*, 202 Ill. 2d 378, 392, 781 N.E.2d 292, 300 (2002).

Again, to support an ineffective assistance claim, a defendant must show both that his counsel's representation fell below an objective standard of reasonableness and also that his case was prejudiced as a result; the failure to meet either prong is fatal. *Strickland*, 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064. Counsel's decision as to what jury instructions to tender is one of several determinations widely recognized as matters of trial strategy that are generally immune from ineffective assistance claims. *People v. Lowry*, 354 Ill. App. 3d 760, 766, 821 N.E.2d 649, 655 (2004).

Defendant argues that his counsel's strategy was not sound because each juror could have applied his or her subjective meanings of "brutal," "heinous" and "wanton cruelty" that differed from the standard definitions listed above. However, considering the graphic testimony in this case, defense counsel engaged in reasonable strategy by foregoing the instructions to minimize the emphasis on Carter's injuries and direct as little attention as possible to the details of the crime.

Defendant contends that regardless of his attorney's request, the trial court was independently required to instruct the jury on the definitions of "brutal," "heinous" and "wanton cruelty." The State asserts, and defendant does not dispute, that this issue was waived when defense counsel did not offer an alternate instruction to the court after requesting that the defining instructions not be given.

Defendant asks this court to engage in a plain error analysis to determine whether the instructions' absence affected his right to a fair trial.

The parties also disagree on the standard of review to be applied. The State argues that an abuse of discretion standard is appropriate, and defendant responds that the trial court's ruling should be reviewed *de novo*, asserting that whether a jury was instructed on the applicable law is a question of law. We agree with the State that a trial court's refusal to issue a specific jury instruction is reviewed under an abuse of discretion standard. *People v. Moore*, 343 Ill. App. 3d 331, 338-39, 797 N.E.2d 217, 224 (2003); *People v. Pinkney*, 322 Ill. App. 3d 707, 720, 750 N.E.2d 673, 683 (2000) (rejecting a similar argument urging *de novo* review).

Defendant asserts that even under the abuse of discretion standard, the trial court had a duty to instruct the jury on the definitions and that the court's failure to offer those instructions constituted an abuse of its discretion. Defendant relies on several opinions that discuss the court's duty to educate the jury on the legal principles relevant to the case to allow it to reach an informed decision.

The record indicates that when the trial court granted defense counsel's request not to instruct the jury on the definitions of those terms, the court stated:

"[The instruction] will not be given. We will hold it to the side. If in fact this jury should come with a note asking for a definition, you know, then I would reconsider at that time. But unless they indicate they need a definition of brutal and heinous, it will not be given."

Instructions should guide the jury in its deliberations and help it to reach a proper verdict through the application of legal principles to the evidence presented. *Moore*, 343 Ill. App. 3d at 338, 797 N.E.2d at 223. However, the trial court does not have a duty to submit a jury instruction over defense counsel's specific objection. The above-quoted comments in the record reflect that the court gave due consideration to the need to define "brutal," "heinous" and "wanton cruelty" for the jury, stating that it would instruct the jury on the definitions of those terms if the jury required such assistance. The trial court indicated that it would balance defense counsel's request with the jury's need to be instructed on the legal principles in the case.

In summary, we conclude that defense counsel was not ineffective in requesting that the jury not receive instructions defining "brutal," "heinous" and "wanton cruelty." Moreover, the trial court was not required to provide those definitions to the jury over counsel's objection.

## b. *Sufficiency of the Evidence*

Defendant's final contention on appeal is that the State did not present adequate evidence to support the jury's finding that Carter's death was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty. He asserts that the State did not offer evidence that he had a violent or extensive criminal history or that he exhibited a lack of remorse about the crime, and he contends that the jury was required to consider those factors in determining his eligibility for an extended-term sentence. He also argues that the State presented no evidence that Carter experienced prolonged pain or suffering. Defendant further contends that his counsel was ineffective in failing to inform the jury that it could consider those factors in determining whether his conduct was exceptionally brutal or heinous behavior indicative of wanton cruelty.

■ Here, the jury found the existence of an aggravating factor that rendered defendant eligible for an extended-term sentence. See 730 ILCS 5/5—5—3.2(b)(2) (West 2002) (the commission of a felony ."accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty"). The State argues that once that threshold finding of eligibility is made, the trial court weighs certain aggravating and mitigating factors, including those discussed by defendant, in determining whether to impose an extended-term sentence and, if so, where the sentence should fall within the statutory range. Defendant agrees that the trial court can exercise discretion in imposing an extended term; however, he contends he was not eligible for such a sentence because the jury did not consider his minimal criminal history of one misdemeanor and no felonies or give weight to his remorsefulness for his actions.

The majority of cases addressing the determination of exceptionally brutal or heinous behavior indicative of wanton cruelty date from the pre-*Apprendi* era when the trial court, not a jury, determined whether a defendant's conduct met that standard and rendered the defendant eligible for an extended-term sentence. The trial court then considered various factors in aggravation and mitigation in imposing a sentence within the range of years provided by statute. In *Apprendi*, the United States Supreme Court held that any factual finding which increases a defendant's sentence beyond the maximum permitted by statute must be proven to a jury beyond a reasonable doubt. *Apprendi*, 530 U.S. at 490, 147 L. Ed. 2d at 455, 120 S. Ct. at 2362-63. Therefore, a bifurcated process now takes place: the jury makes the initial determination of a defendant's eligibility for an extended-term sentence (here, based on the existence of exceptionally brutal or heinous behavior indicative of wanton cruelty). If that finding is made,

the trial court has the discretion to sentence the defendant to an extended term within the statutory range.

Defendant argues that the jury did not consider all of the pertinent evidence in deciding that he was eligible for an extended term, citing, *inter alia*, the Illinois Supreme Court decisions in *People v. Andrews*, 132 Ill. 2d 451, 548 N.E.2d 1025 (1989), and *People v. Palmer*, 148 Ill. 2d 70, 592 N.E.2d 940 (1992). In *Andrews*, the supreme court found an extended-term sentence unjustified because the defendant did not have a violent criminal history and no evidence was offered to show that he demonstrated a callous demeanor or lack of remorse; furthermore, the defendant expressed sorrow for his crime at his sentencing hearing. *Andrews*, 132 Ill. 2d at 466, 548 N.E.2d at 1032.

Defendant contends that his lack of a felony history and his attitude of remorsefulness were relevant to his eligibility for an extended-term sentence and that the State therefore was required to present evidence to the jury on those points. This court addressed a defendant's similar contention in *People v. Lewis*, 334 Ill. App. 3d 993, 779 N.E.2d 490 (2002), which involved a trial court's assessment of whether a defendant's behavior was exceptionally brutal or heinous indicative of wanton cruelty that would make him eligible for a life sentence. Relying on *Andrews*, the defendant contended that the trial court abused its discretion by failing to consider his criminal history, remorse or lack thereof and premeditation, among other factors. *Lewis*, 334 Ill. App. 3d at 1003, 779 N.E.2d at 498. Although the court considered those factors set out in *Andrews*, it found *Andrews* to be factually distinct. *Lewis*, 334 Ill. App. 3d at 1004, 779 N.E.2d at 499. *Lewis* noted that additional factors used in weighing exceptionally brutal and heinous behavior indicative of wanton cruelty involve the details of the crime and the defendant's conduct in particular. *Lewis*, 334 Ill. App. 3d at 1008, 779 N.E.2d at 503.

When considering whether an offense rises to the level of exceptionally brutal or heinous behavior indicative of wanton cruelty, courts have focused largely on the totality of the facts surrounding the offense as opposed to the extent or nature of the defendant's participation or other factors unique to the defendant. *Palmer*, 148 Ill. 2d at 89, 592 N.E.2d at 949; *People v. Kennedy*, 336 Ill. App. 3d 425, 431, 782 N.E.2d 864, 870 (2002). Factors traditionally considered in assessing a crime's brutality or heinousness have included premeditation, the unprovoked or senseless nature of the attack, the number of wounds inflicted and the extent of the victim's injuries. See *Kennedy*, 336 Ill. App. 3d at 431, 782 N.E.2d at 870 (considering those circumstances in deciding whether the defendant was eligible for a life sentence based on exceptionally brutal or heinous behavior indicative of wanton cruelty); *Lewis*, 334 Ill. App. 3d at 1008, 779 N.E.2d at 503.

Here, defendant's enhanced sentence was triggered by the jury's finding of exceptionally brutal or heinous behavior indicative of wanton cruelty. A finding that a crime was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty is a factual question that involves the weighing of the evidence presented at trial. *People v. Bryant*, 325 Ill. App. 3d 448, 457, 758 N.E.2d 430, 437 (2001). As both parties to the instant case discuss, this analysis was noted in the dissent in *People v. Lindsay*, 247 Ill. App. 3d 518, 536-38, 617 N.E.2d 389, 399 (1993) (Doyle, J., dissenting). In *Lindsay*, the majority cited *Andrews* to support its inclusion of premeditation, remorse and the defendant's criminal history among the factors to be considered in finding whether the defendant engaged in exceptionally brutal or heinous behavior indicative of wanton cruelty. *Lindsay*, 247 Ill. App. 3d at 532-33, 617 N.E.2d at 399. The court concluded that the trial court erred in holding that the defendant exhibited exceptionally brutal or heinous behavior indicative of wanton cruelty, reviewing the details of the crime and noting the defendant's age of 19 and the nonviolent nature of his criminal record. *Lindsay*, 247 Ill. App. 3d at 534, 617 N.E.2d at 400.

The dissent in *Lindsay* opined that the majority erroneously intertwined the issue of whether the defendant displayed exceptionally brutal or heinous behavior indicative of wanton cruelty with the separate consideration of the number of years to which the defendant should be sentenced given the aggravating and mitigating factors in the case:

"Section 5—5—3.2(b)(2) specifically refers to 'the offense' of which the defendant was convicted. It seems to follow, therefore, that any determination of whether the offense has been accompanied by exceptionally brutal or heinous behavior must be limited to an examination of a defendant's actions surrounding the commission of the offense as opposed to the various other factors of aggravation and mitigation. Yet, in an effort to explain the apparent conclusion that the sentence was excessive, the majority refers to the defendant's age and nonviolent criminal record as if those factors are relevant to the issue of how [the] defendant acted while committing the crime." *Lindsay*, 247 Ill. App. 3d at 537, 617 N.E.2d at 402 (Doyle, J., dissenting).

Because we agree with the viewpoint espoused in the dissent in *Lindsay*, we hold that the jury here was not required to consider defendant's criminal history in determining whether he was eligible for an extended-term sentence. As we will discuss further below, the defendant's criminal record was properly considered by the trial court in determining what sentence defendant should receive within an

extended term. Accordingly, defendant's counsel was not required to tell the jury it could consider defendant's criminal history in deciding whether his actions constituted exceptionally brutal or heinous behavior indicative of wanton cruelty.

As juries and judges operate in the post-*Apprendi*, two-stage process of imposing an extended-term sentence, the jury's initial consideration of whether the offense was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty must be based on the defendant's conduct and the facts pertinent to the offense. Those facts can include premeditation and lack of remorse for a crime, since those considerations relate to the defendant's behavior and whether an act was accompanied by "wanton cruelty." See *Lewis*, 334 Ill. App. 3d at 1004-05, 779 N.E.2d at 500. Here, defendant acknowledges that the State offered evidence as to premeditation. As to defendant's remorse or lack thereof, the record is devoid of any evidence or testimony by defendant that he felt or exhibited regret for Carter's death, and defendant does not direct our attention to any.

Having considered the senseless nature of Carter's murder and the extent of his injuries, we conclude that the jury was presented with evidence that was more than sufficient to support a finding that the crime was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty. The evidence established that Carter received multiple stab wounds to his neck and spinal cord while he was still alive. The medical examiner testified that one of the neck wounds inflicted before Carter died was consistent with being produced by an ax. The evidence further showed that Carter's arms and legs were severed with an ax after he died. Defendant's conduct was devoid of mercy or compassion.

Defendant further contends that any wounds inflicted after Carter died should not have been considered in determining whether Carter experienced prolonged pain and suffering, which is relevant to a finding of "wanton cruelty." Defendant relies upon *People v. Nielson*, 187 Ill. 2d 271, 299, 718 N.E.2d 131, 148 (1999), in which the supreme court observed that one "cannot consciously seek to inflict pain and suffering on a dead body, as a dead body feels nothing." He asserts that Carter could have died of the stab wounds before the ax was used and therefore was not subjected to prolonged pain. Defendant also argues that the fact that Carter's body was partially burned after he died was not relevant to the exceptionally brutal or heinous analysis because it pertained to the concealment of the crime and not to the manner of Carter's death.

Although the medical examiner testified that it was unclear whether Carter was alive when his head was cut off, she stated that a

wound near Carter's spinal cord and other neck wounds were consistent with being inflicted by an ax while Carter was alive. The evidence clearly supported a finding that defendant's behavior was exceptionally brutal or heinous and indicative of wanton cruelty. After the jury found the existence of that triggering factor, thus making defendant eligible for an extended-term sentence, it was the trial court's role to consider aggravating and mitigating circumstances in deciding whether to impose an extended-term sentence and determining a sentence within the statutory range of 60 to 100 years.

The record reflects that the trial court weighed defendant's lack of a violent criminal record in determining the length of his sentence. See *Lewis*, 334 Ill. App. 3d at 1004, 779 N.E.2d at 499 (noting that an absence of criminal history is a mitigating factor in sentencing under section 5—5—3.1(7) of the Code (730 ILCS 5/5—5—3.1(7) (West 1998))). At sentencing, the trial court noted its review of the presentence report indicating that defendant had one prior misdemeanor conviction and no prior felony convictions. Defense counsel argued to the court that defendant's criminal record was limited. However, the lack of a felony record did not outweigh the other evidence presented as to Carter's death, and the trial court was not required to give defendant's criminal history more emphasis than any other factor.

Lastly, we note that defendant compares his personal circumstances to those of other defendants in a number of cases in which extended-term sentences were reversed or where the evidence was not found to prove exceptionally brutal or heinous behavior indicative of wanton cruelty beyond a reasonable doubt. We agree with the State that such comparisons are of no value. See *People v. Fern*, 189 Ill. 2d 48, 56, 723 N.E.2d 207, 210 (1999) (stating that "[t]he propriety of the sentence imposed in a particular case cannot properly be judged by the sentence imposed in another, unrelated case"); *People v. Blackwell*, 325 Ill. App. 3d 354, 361-62, 757 N.E.2d 589, 596 (2001).

Because the State proved beyond a reasonable doubt that defendant acted in an exceptionally brutal or heinous manner indicative of wanton cruelty and the trial court considered the evidence presented in aggravation and mitigation, we will not disturb defendant's extended-term sentence. We recognize that, as the supreme court has stated, all murders are inherently brutal and heinous and the extended-term sentencing provisions are intended to impose higher penalties for killings that are exceptionally so. See *Andrews*, 132 Ill. 2d at 466, 548 N.E.2d at 1032. However, based on the circumstances of this case, the evidence supported the jury's finding that defendant engaged in exceptionally brutal or heinous behavior indicative of

wanton cruelty and further supported the trial court's imposition of a 70-year sentence.

In summary, we hold that defendant's counsel was not ineffective in failing to object to Lindo's testimony or failing to request an instruction on the offense of concealment. In addition, the trial court was not required to instruct the jury on the definitions of "brutal," "heinous" and "wanton cruelty" over defense counsel's objection. Moreover, the evidence was sufficient to support defendant's 70-year extended-term sentence for first degree murder based on the circumstances of Carter's death.

Accordingly, defendant's convictions and sentence are affirmed.

Affirmed.

O'MARA FROSSARD and NEVILLE, JJ., concur.