NOTICE
This order was filed under Supreme
Court Rule 23 and may not be cited
as precedent by any party except in
the limited circumstances allowed
under Rule 23(e)(1).

2020 IL App (4th) 170947-U

NO. 4-17-0947

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
June 15, 2020
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Champaign County |
| ROBBIE M. PATTON, | ) | No. 16CF1349 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Roger B. Webber, |
| | ) | Judge Presiding. |

JUSTICE HARRIS delivered the judgment of the court.
Presiding Justice Steigmann and Justice Cavanagh concurred in the judgment.

**ORDER**

¶ 1    *Held*: (1) Defendant is not entitled to a new trial based on the State's failure to timely disclose favorable impeachment evidence where the evidence was not "material."

(2) Defendant was not denied his right to a fair trial due to the ineffectiveness of his defense counsel or the trial court's evidentiary rulings.

(3) The trial court did not commit reversible error when inquiring into defendant's *pro se* posttrial claims of ineffective assistance of counsel.

(4) Defendant forfeited his sentencing claim of error and the plain-error doctrine does not apply to excuse his forfeiture.

¶ 2    Following a jury trial, defendant, Robbie M. Patton, was found guilty of one count of first-degree murder (720 ILCS 5/9-1(a)(1) (West 2014)) and three counts of aggravated battery with a firearm (*id.* § 12-3.05(e)(1)). The trial court sentenced him to concurrent prison terms of 60 years for first-degree murder and 9 years for each aggravated-battery conviction. Defendant

appeals, arguing (1) he is entitled to a new trial due to the State's failure to timely disclose information favorable to him in violation of *Brady v. Maryland*, 373 U.S. 83 (1963); (2) he did not receive a fair trial due to his counsels' ineffectiveness and because the court improperly allowed the admission of an unfairly prejudicial video into evidence; (3) the court erred when conducting a preliminary *Krankel* inquiry (see *People v. Krankel*, 102 Ill. 2d 181, 464 N.E.2d 1045 (1984)) into his *pro se* posttrial ineffective-assistance-of counsel claims; and (4) his 60-year prison sentence for first-degree murder was excessive. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4            In September 2016, the State charged defendant with three counts of first-degree murder (720 ILCS 5/9-1(a)(1), (a)(2) (West 2014)) and three counts of aggravated battery with a firearm (*id.* § 12-3.05(e)(1)), alleging he shot and killed one victim—George Korchev—and discharged a firearm, injuring three others—Erik Lasaine, Robert Shepard, and Moses Lopez. The State's theory of the case was that defendant shot the victims after becoming angry over the battery of another individual.

¶ 5            Prior to trial, defendant filed several motions *in limine*, including two in which he sought to bar the State from presenting evidence that he had previously been convicted of aggravated discharge of a firearm in Champaign County case No. 15-CF-1773, and that he was on mandatory supervised release (MSR) for that crime on the date of the alleged offenses. Following a hearing, the trial court granted both motions.

¶ 6            The record reflects defendant also filed a motion *in limine* to bar the State from presenting evidence of a video recording posted on " 'Flipagram[,]' a mobile phone application/internet site" (Flipagram video). Defendant argued, in part, that the Flipagram video

was overly prejudicial because it depicted him "making 'finger guns' " and " 'shooting' at the camera with his 'finger guns.' " During a hearing on the motion, the State argued that the portion of the Flipagram video it intended to present consisted "of a brief approximately five to six second clip of *** defendant at the scene where the shooting occurred." It argued the clip was relevant to show defendant's location and how he was dressed prior to the shooting, as well as his mental state, *i.e.*, that defendant had "this idea or this image of himself shooting." The trial court ultimately denied defendant's motion to bar the Flipagram video, stating as follows:

"What I see [in the Flipagram video,] in the part that is being described as the defendant pointing a finger gun[,] is the defendant smiling and joking *** to presumably a friend or colleague, and making a hand gesture that you have described as a finger gun, but in the court's experience in life, which I don't believe I'm required to set aside, friends frequently will make a gesture like that, and in the context it's not much different than waving at your friend. *** I don't think in the context that it shows any frame of mind or propensity; it shows a defendant waving or making a gesture to a friend of his. I don't think it is that prejudicial. [The] State is entitled to prove [its] case and [it] need[s] to show the defendant present at the location and then the clothing that is being worn and the things of that nature[.]"

¶ 7        In September 2017, defendant's jury trial was conducted. Evidence showed that at around 12:30 a.m. on September 25, 2016, the four victims were shot while walking on a pathway behind the Evergreen Tobacco Shop (Evergreen Tobacco), located on East Green Street in Champaign, Illinois. Korchev was shot in the "left back" and died as a result. Lasaine was also shot in the back, while Shepard and Lopez both suffered gunshot wounds to their right arms.

¶ 8        Lasaine and Shepard testified at trial along with Korchev's girlfriend, Samantha Steinburg, who had been walking with the victims on the night of the shooting. None of the witnesses observed either the shooter or anyone with a weapon. Steinburg testified that they had walked past Evergreen Tobacco and the shots sounded like they came from behind and to the left. Lasaine testified that although he did not see the shooting, he thought the shooter had been in a car that almost crashed into the group just prior to when the shooting occurred. He testified: "So just in my mind I thought that one danger [led] to the next, I thought they were connected." Lasaine, however, acknowledged that he was shot in the back and did not know "where the shots could have come from."

¶ 9        Evidence also showed that earlier the same night, a party, attended by a large number of people, occurred in an apartment above Evergreen Tobacco. After the party ended, fights broke out among the party's attendees in and around the parking lot outside the shop. During one of the fights, an individual named Edwin McCraney was battered and left lying bleeding and unconscious on the sidewalk.

¶ 10       The State's evidence showed defendant attended the party with friends. Testimony and video evidence, including the Flipagram video, showed defendant outside the area of Evergreen Tobacco on his way to the party and before the shooting. Defendant was dressed in all black and wearing a white hat and white shoes.

¶ 11       The State submitted video surveillance evidence, including footage from two different cameras outside of Evergreen Tobacco—one facing East Green Street, located to the south of the shop, and a second facing the parking lot, located to the west of the shop. The surveillance footage showed the fight involving McCraney. Following that fight, defendant

- 4 -

appeared on the street-facing surveillance video walking up to the area where McCraney was lying on the ground. Not long after, the video showed defendant removing his white hat, pulling up the hood of his black sweatshirt and cinching it around his face, and then running off camera in the direction of the parking lot and the pathway where the shooting ultimately occurred. Approximately 10 seconds after defendant is shown running out of view, the surveillance video showed the crowd outside Evergreen Tobacco reacting to gunshots and running in the opposite direction.

¶ 12        The State presented testimony of several individuals who were located outside of Evergreen Tobacco at the time of the shooting. Brianna Allen testified she knew defendant and, at some point, the two had a dating relationship. While outside Evergreen Tobacco in the minutes before the shooting, she observed defendant yelling, "getting angry and mad," and "going crazy." Allen testified she tried to calm defendant down, but he told her to "[g]et off" of him. Shortly thereafter, she observed defendant run off in the direction of the parking lot.

¶ 13        Derrick Francois testified he knew defendant and observed the fight involving McCraney. He saw the individuals who battered McCraney move away from the scene and another group, whom he described as "the Mexicans," come up to look at McCraney. Those individuals then "ran back into the parking lot." At trial, Francois denied seeing anyone with a gun or that he observed anyone yelling about using a gun. However, the State submitted a prior videotaped statement Francois gave to the police in which he reported that, while standing near where McCraney was lying, defendant pulled out a gun and said "if anyone runs up, I'm gonna let this b**** ride." Defendant presented evidence that Francois also previously reported to the police that he saw a "tall Mexican" pull up his shirt and show a gun.

¶ 14        Desmond Droughns testified he had been at the party above Evergreen Tobacco with Lopez, one of the shooting victims. After leaving the party he observed someone outside on the ground being helped by others. Droughns testified he was walking in the parking lot when he heard the gunshots. He identified himself and his location on the parking-lot facing surveillance video. Droughns further testified that he observed the shooter, who was dressed in all black or all dark clothing. As part of his case, defendant presented the testimony of police officer Kaitlyn Fisher, who stated she spoke with Droughns at the scene and that Droughns reported he "was running away, heard multiple gunshots, and he *** looked back and saw" that Lopez had been shot.

¶ 15        Ninia LeShoure testified she attended the party and was standing in the middle of the parking lot when the shooting occurred. She observed "a person in all black" shooting. LeShoure did not see the shooter's face and estimated that she had been standing 20 to 50 feet away.

¶ 16        Defendant's cousin, Mary Jane Renne Ash, attended the party and described the shooter as taller than her, "slimmer," "dressed in all black," and wearing "a hood." She was not able to see the shooter's face. After the shooting, Ash observed the shooter run between two buildings. On cross-examination, Ash testified that she saw "someone with a gun" as she exited the party before the shooting. She stated she did not believe defendant could have been the shooter because defendant was the same height as her and "chubby." On redirect examination, Ash testified she "figured" that the person she saw with a gun before exiting the party was also the shooter because "he was in the same clothing" and was the same height as the shooter. Further, she clarified that she did not believe defendant was the shooter because when she saw him one to two hours

- 6 -

after the shooting, he was wearing gray and white, not black.

¶ 17 Ania Clark testified she knew defendant because they went to the same school and she had "seen him around." She asserted she was being "forced" to testify and did not want to be in court. Clark stated she attended the party above Evergreen Tobacco and was "[i]n the middle of the parking lot" when the shooting occurred. She saw the shooter and described that person as wearing dark clothing and a hood. After viewing video surveillance footage from Evergreen Tobacco's parking-lot-facing camera, Clark agreed that a hooded figure in dark clothing ran past her, bumping into her and, a few seconds later, shots were fired. The record shows the time reflected on the surveillance camera at that moment corresponded to the time the street-facing camera captured defendant running in the direction of the parking lot. When asked whether the hooded figure who brushed by her was the shooter, Clark responded "[p]ossibly, yes."

¶ 18 On cross-examination, Clark testified that she could not say for certain whether the person who brushed by her was the same person she saw shooting a gun. She also testified that the person who brushed by her was not the only male she saw that night wearing black. As part of its case, the State presented evidence of Clark's prior videotaped statement to the police, in which she reported that the shooter was African American, wearing a black hoodie and dark jeans, and a little bit shorter than her. She also reported that when the hooded figure brushed by her in the parking lot, her friend "happened to see the gun."

¶ 19 Markell Sanders testified he knew defendant and he acknowledged being one of the individuals who battered McCraney on the night of the shooting. At the time of trial, he was "in custody for that aggravated battery," and had already pleaded guilty. Sanders testified he was in the parking lot when the shooting occurred. He saw "somebody in all black" wearing a hat, firing

a gun. At trial, Sanders stated he was unable to recognize the shooter and denied that he saw defendant fire a gun. However, the State presented Sanders's prior videotaped statement to the police in which he reported that he saw defendant shooting, had a "decent view of [defendant] shooting," and was "sure it was him." Defendant also played a portion of Sanders's prior videotaped statement, in which he denied seeing a gun, stating he "wasn't really that close."

¶ 20        Rolan Jones testified he attended the September 2016 party above Evergreen Tobacco. At some point, he left the party and went outside because it was hot. He saw people fighting outside and saw defendant in the parking lot holding a gun. Jones testified defendant was "going off" and yelling loudly. He recalled previously telling the police that defendant was wearing a black hoodie and asking "who the f*** did this? Where they at?" Jones stated he also observed defendant move "further into the parking lot" and shoot the gun at a group of "Mexicans."

¶ 21        Jones acknowledged that he was "in custody," had a prior conviction for aggravated battery for which he received a sentence of probation, was subject to a pending petition to revoke his probation, and had "a pending case for a home invasion." He testified that he did not anticipate his testimony would help him in any way on his pending cases and denied that he had "any expectations from [his] testimony" or that any promises had been made to him.

¶ 22        Evidence also showed that in September 2016, defendant resided with his great-grandmother, Lovie Taylor, on East Washington Street in Champaign, several blocks north of the scene of the shooting. Taylor testified that on September 25, 2016, defendant arrived home sometime between 12:30 a.m. and 1 a.m.

¶ 23        The State presented evidence that immediately following the shooting, an individual in dark clothing and white shoes was captured on surveillance video running by the

Chabad Center for Jewish Life, located north of the scene of the shooting. Also, approximately one block north of where the shooting occurred, the police found a discarded black hooded sweatshirt on a ground-level patio of an apartment building. Evidence showed deoxyribonucleic acid (DNA) was found on the cuffs and the cord of the sweatshirt and that DNA samples from the sweatshirt matched defendant's DNA profile. The chance of the sweatshirt DNA samples otherwise matching "another random person in the population [was] in the nonillions." Additionally, both sleeves of the sweatshirt also tested positive for gunshot residue.

¶ 24    The State's evidence further showed that near where the black hooded sweatshirt was discovered, portions of a vinyl fence had been damaged. Police officer David Allen testified a partial shoe print impression was found on one of the damaged fence panels that appeared similar to a Nike Air Force 1 shoe. Allen stated that, following a search of defendant's residence, a box for Nike Air Force 1 shoes was discovered, but not the shoes themselves.

¶ 25    Defendant presented testimony from police officer Jeremiah Christian, who investigated the battery on McCraney and participated in executing a search warrant on the residence of two suspects in that offense. During the search, three pairs of Nike Air Force 1 athletic shoes were discovered, which Christian described as a "very common" type of shoe.

¶ 26    As part of its case, the State presented surveillance video footage from the apartment building next to Evergreen Tobacco. That video showed defendant approximately two hours after the shooting wearing light-colored clothing, *i.e.*, white pants and a light gray hooded sweatshirt. The State's evidence also included an audio recording of a phone call defendant made while in jail, in which he is heard stating that he received his "motion for discovery" and would be able to see "who told."

¶ 27        Finally, defendant presented testimony from Andy Lombume, who stated that sometime between midnight and 1 a.m. on the night of the shooting, a black car backed into his vehicle as he was driving near the location of the shooting. After backing into Lombume, the black car left the scene.

¶ 28        After deliberating for approximately two hours, the jury found defendant guilty of each charged offense. In November 2017, defendant *pro se* filed a letter alleging his defense attorneys, Tony Allegretti and Janie Miller-Jones, were ineffective. Defendant argued that his attorneys improperly failed to present the testimony of six witnesses, including McCraney, who would have testified that he did not know defendant and that the two were not friends; Nyziria Brown, Johnnie Holbrook, Lucas McQueen, and Moses Lopez, who would have testified that defendant was not the shooter; and Jeffery Alexander-Jordon, who would have testified that he saw "[H]ispanics" with guns and not defendant. (The record reflects additional documents were attached to defendant's *pro se* letter that appeared to raise more claims of ineffectiveness; however, defendant ultimately informed the trial court that he did not intend to include those documents or claims in his correspondence to the court.)

¶ 29        The same month, defendant, with the aid of counsel, filed a motion for a new trial. Relevant to this appeal, he alleged (1) the trial court erred by denying his pretrial motion *in limine* to bar the Flipagram video at trial and (2) the State failed to timely disclose impeachment evidence in violation of *Brady*, 373 U.S. 83. With respect to the latter claim, defendant specifically alleged the State failed to disclose a recorded police interview with a prosecution witness, Rolan Jones, that occurred days before defendant's trial and during which Detective Robert Morris of the Champaign Police Department discussed Jones's testimony in defendant's case and agreed "to aid

- 10 -

*** Jones with his own pending criminal matters."

¶ 30 On November 21, 2017, the trial court conducted a hearing on defendant's motion for a new trial. The parties presented argument to the court regarding defendant's claim of a *Brady* violation, as well as recordings of two interviews Jones had with the police. The first recording occurred in September 2016 shortly after the shooting incident and the second was of the undisclosed interview, occurring in September 2017 just before defendant's trial. Following the parties' arguments, the court took the matter under advisement.

¶ 31 In December 2017, the trial court conducted a hearing and denied defendant's motion for a new trial. With respect to defendant's *Brady* claim, the court summarized Jones's September 2017 interview with Detective Morris as follows:

"On September 21, 2017, Morris had arrested Jones on an outstanding warrant that had been issued on August 2, 2017[,] based on a probation violation in Case No. 17-CF-143. It appeared that Jones had also been interviewed by another detective about unrelated crimes in which Jones was a suspect. During the interview, Morris told Jones that he also had a subpoena to testify in [defendant's] case. Morris encouraged Jones to tell the truth about the shooting and to do the right thing and that good things would happen to him. He specifically indicated that he needed to testify to the things he had said in a September 29, 2016[,] recorded interview in which [Jones] also had identified *** defendant as the shooter.

Morris did not promise any specific benefit and in fact pointed out that only the State's Attorney can make that type of promise. However, he did tell Jones that after he testified that Morris would speak favorably on his behalf to the State's

- 11 -

Attorney's Office, and he made statements suggesting that his word ha[d] carried substantial weight or produced good results for others in the past. Additionally, he hinted that files on the other detective's desk might not have to be turned over to the State."

Ultimately, the court found the State failed to disclose impeachment evidence that was favorable to defendant. However, it agreed with the State that such evidence was not material, stating it could not conclude that the undisclosed evidence "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict."

¶ 32        On December 14, 2017, the trial court conducted defendant's sentencing hearing. At the outset of the hearing, it inquired into defendant's *pro se* claim that his defense attorneys were ineffective for failing to call the six identified witnesses to testify on his behalf at trial. The court questioned defendant regarding his claims as well as his counsel, Allegretti and Miller-Jones. Ultimately, the court determined further relief was unwarranted, finding that defendant's allegations were either "unsubstantiated conclusions or were the result of strategic tactical decisions made by counsel."

¶ 33        The matter next proceeded with sentencing. The trial court stated it received defendant's presentence investigation (PSI) report, which showed defendant was born on November 19, 1997, and approximately two months shy of his 19th birthday at the time of the underlying offenses. He had prior convictions for aggravated fleeing a peace officer and aggravated discharge of a firearm, a Class 1 felony, for which he was sentenced to eight years in the Illinois Department of Correction (DOC). The PSI report also showed that in June 2016, defendant was accepted into DOC's Impact Incarceration program. On September 9, 2016, a little

over two weeks before the shooting, defendant was "[r]eleased on [s]upervision." Finally, defendant had not earned either his high school diploma or a general equivalency degree (GED) and he had never been employed.

¶ 34        As evidence in aggravation, the State presented testimony from Detective Allen regarding defendant's prior felony conviction for aggravated discharge of a firearm. In connection with that offense, defendant and a friend had entered a Steak 'n Shake restaurant and became involved in a dispute with an employee who had an ex-girlfriend in common with defendant's friend. Following a discussion, "[t]hey walked outside" and "[b]efore anything could happen, [defendant] went to a car and got a gun and started shooting." Defendant was sentenced for the offense to DOC and paroled in September 2016.

¶ 35        Detective Allen further testified that through the course of his investigation of defendant he found Facebook posts with pictures of defendant. One photograph of defendant, posted in April 2015 to defendant's Facebook page, included the caption "Lil Shoota Inaa Cut." Other photographs posted to defendant's sister's Facebook page showed defendant holding a gun.

¶ 36        The State also presented testimony from Josh Sapp, a sergeant with the Corrections Division of the sheriff's office. Sapp described a fight that defendant was involved in while in jail in October 2017. He stated defendant instigated the fight by challenging another inmate who, according to defendant, attempted "to run the block" and told other inmates that defendant had "issues" with them. Additionally, Sapp testified defendant made the statement that "he was going to go to prison for the rest of his life[,] so he didn't care who he hurt." A recording of the fight was played for the trial court. The court was also presented with several victim impact statements.

¶ 37        In mitigation, defendant presented a letter from Angela Bell, a school social worker

- 13 -

and defendant's grandmother's first cousin. Bell asserted she had known defendant all his life and described him as a caring and loving person who felt remorse for his actions. She also described difficulties defendant experienced following his father's illness and death, which occurred in 2013. Bell noted that defendant was home when his father had a heart attack and died, and that defendant tried to revive his father and get help.

¶ 38      In presenting argument to the trial court, the State asked for the imposition of the maximum penalties allowable. Defendant's counsel argued for a minimum sentence and asked the court to consider defendant's youth and its attendant characteristics, including impetuosity, impulsivity, and immaturity, as well as defendant's "childhood trauma" and the impact of his father's death.

¶ 39      In pronouncing its sentence, the trial court discussed the need for deterrence and characterized defendant's prior criminal history as "serious," finding that similarities between his prior felony offense and the current case were "a little bit eerie." In discussing mitigating factors, the court noted defendant's youth, stating as follows:

> "[Defendant] is only 20 years old and by definition of being that age[,] as [defense counsel] pointed out[,] a teenager's brain is not completely developed and we are all still pretty immature at that age, not nearly completed in development and not the person that [defendant] will be when he is released from prison if that ever happens so you would think just by virtue of being 20 there is some capacity for rehabilitative potential. However, the prior record and the behavior of *** [d]efendant since his last sentence to prison severely undercuts that argument.

* * *

- 14 -

"I considered the comments from [defendant's] aunt [*sic*] who still believes there is good in [defendant] and I hope that she is correct although the record before me leaves little reason to believe that \*\*\*."

Ultimately, the court sentenced defendant to concurrent prison terms of 60 years for first-degree murder and 9 years for each aggravated-battery conviction. Defendant did not file a postsentencing motion.

¶ 40    This appeal followed.

¶ 41                              II. ANALYSIS

¶ 42                              A. *Brady* Violation

¶ 43    On appeal, defendant first argues that he is entitled to a new trial because the State committed a *Brady* violation by failing to timely disclose evidence that was beneficial to his case. He argues the undisclosed evidence could have been used to impeach Jones, whom he characterizes as "the State's star witness," regarding whether Jones expected to receive a benefit from testifying against defendant. Defendant additionally argues that the undisclosed evidence was plainly material under *Brady* because Jones was the only eyewitness to the shooting who identified defendant as the shooter when testifying at trial and that "the identity of the shooter was the core dispute before the jury."

¶ 44    Under the Supreme Court's decision in *Brady*, 373 U.S. at 87, "the prosecution violates an accused's constitutional right to due process of law by failing to disclose evidence favorable to the accused and material to guilt or punishment." *People v. Beaman*, 229 Ill. 2d 56, 73, 890 N.E.2d 500, 510 (2008). "This rule encompasses evidence known to police investigators, but not to the prosecutor." *Id.* Further, a *Brady* claim requires that the following be established:

"(1) the undisclosed evidence is favorable to the accused because it is either exculpatory or impeaching; (2) the evidence was suppressed by the State either wilfully or inadvertently; and (3) the accused was prejudiced because the evidence is material to guilt or punishment." *Id.* at 73-74.

¶ 45 Here, there appears to be no dispute among the parties that the first two requirements for finding a *Brady* violation have been shown, *i.e.*, that the prosecution suppressed, even if inadvertently, impeachment evidence that was favorable to defendant. Ultimately, this appeal turns on the third requirement—whether the undisclosed evidence was material to defendant's guilt. The trial court found that the evidence was not material and, following our review of the record, we agree with that determination.

¶ 46 In the context of a *Brady* violation, "[e]vidence is material if there is a reasonable probability that the result of the proceeding would have been different had the evidence been disclosed." *Id.* at 74. The test is not one requiring an examination of the sufficiency of evidence. *People v. Coleman*, 183 Ill. 2d 366, 393, 701 N.E.2d 1063, 1077 (1998). Instead, "[m]ateriality is demonstrated 'by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.' " *Id.* (quoting *Kyles v. Whitley*, 514 U.S. 419, 435 (1995)). Additionally, the Supreme Court has "observed that evidence impeaching an eyewitness may not be material if the State's other evidence is strong enough to sustain confidence in the verdict." *Smith v. Cain*, 565 U.S. 73, 76 (2012).

¶ 47 Finally, a *Brady* claim "requires applying established law to the facts, including those elicited at the evidentiary hearing." *Beaman*, 229 Ill. 2d at 73. On appeal, we review the trial court's decision for manifest error. *Id.* "Manifest error is error that is clearly evident, plain, and

- 16 -

indisputable." (Internal quotation marks omitted.) *Id.*

¶ 48     In this case, the evidence at trial established that defendant attended the party above Evergreen Tobacco on the night of the shooting. Upon his arrival at the party, he was dressed in dark clothing with a white hat and shoes. Around 12:30 a.m., in the minutes before the shooting, defendant was shown on surveillance video in the area where McCraney was lying unconscious and bleeding. Evidence was presented that defendant appeared angry and that he was "going crazy." He was shown on video removing his white hat and pulling up and cinching the hood of his black sweatshirt. Defendant was also shown running in the direction of the shooting only seconds before it occurred. The numerous eyewitness descriptions of the shooter were consistent with defendant's appearance and clothing at the time of the shooting. Following the shooting, surveillance footage captured a figure in dark clothing running in a northerly direction, the same direction of defendant's residence. A discarded black hooded sweatshirt with defendant's DNA, and which tested positive for gunshot residue, was discovered in the same area. Defendant's great-grandmother testified he arrived home sometime between 12:30 and 1 a.m. Approximately two hours after the shooting, defendant appeared on video surveillance footage dressed in different, lightly colored clothing.

¶ 49     On appeal, defendant repeatedly points out that Jones was the only eyewitness who identified defendant as the shooter when testifying at trial. However, Jones was not the only eyewitness to make such an identification following the shooting. At trial, the State was allowed to present evidence of other witnesses' prior recorded statements to the police as substantive evidence pursuant to section 115-10.1 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-10.1 (West 2014)). See also *People v. Curtis*, 296 Ill. App. 3d 991, 996-99, 696 N.E.2d

- 17 -

372, 376-77 (1998) (holding evidence admitted under section 115-10.1 is not a " 'suspect category' " of evidence). In one such recorded statement, Sanders, a witness for the State who was familiar with defendant, identified defendant as the shooter, stating he was "sure it was him." In another statement, Francois, who also knew defendant, reported seeing defendant with a gun immediately prior to the shooting and hearing him threaten to "let this b**** ride" if anyone ran up to him. Finally, evidence showed that Clark previously provided a description of the shooter to the police that was consistent with defendant's appearance prior to the shooting, stating the shooter was African American and wearing a black hoodie and dark jeans.

¶ 50        Ultimately, the record shows that the State presented strong evidence of defendant's guilt through both eyewitness statements and highly incriminating circumstantial evidence. When viewing the evidence in its entirety, we find the undisclosed impeachment evidence could not "reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." (Internal quotation marks omitted.) *Coleman*, 183 Ill. 2d at 393.

¶ 51        We note that in finding the undisclosed evidence was not material, the trial court also pointed out that, had defendant impeached Jones with evidence that he had a motive to testify falsely, *i.e.*, that he expected a benefit from his testimony against defendant, the State could have rehabilitated Jones with his prior consistent statement to the police given only days after the shooting in September 2016. On appeal, defendant responds to this suggestion by arguing that Jones's first interview with the police in September 2016 could not have been rehabilitative because statements made during the undisclosed interview in September 2017 suggested Jones also expected a benefit from providing information to the police during his first interview in September 2016. In particular, defendant notes references in the undisclosed interview to a

previous meeting between Jones and Detective Morris and the suggestion that Detective Morris allowed Jones to "walk out of the door" after that meeting despite having probable cause to arrest Jones. We disagree with defendant's assertions.

¶ 52 First, the undisclosed interview from September 2017 makes no explicit reference to the September 2016 interview. Rather, during the undisclosed interview, Jones and Detective Morris spoke about the "last time" they met. As defendant acknowledges on appeal, the record indicates "Jones had several interactions with the criminal justice system" after his September 2016 interview and before September 2017, when the undisclosed interview took place. Second, as noted by the State, when speaking of the "last time" he met with Jones, Detective Morris noted the presence of another detective who was "taller" and with a "bald head" that spoke with Jones about his "other cases." The recording of the September 2016 interview does not reflect the presence of such an officer, nor does it contain references to any promises made to Jones in exchange for his statement, suspicions that he was involved in any criminal activity, or any "other cases" or pending charges.

¶ 53 The record does show that, in 2017, Jones was charged with committing a home invasion that occurred in July 2016, before the date of the shooting and his initial police interview; however, nothing in the record indicates Jones was under suspicion or being investigated for that crime in September 2016, when his prior consistent statement was given. Accordingly, we agree with the trial court that had Jones been impeached with the undisclosed interview, he could have been rehabilitated with his prior consistent statement to the police.

¶ 54 After reviewing the record and the evidence presented at trial in its entirety, we find no manifest error in the trial court's determination that the undisclosed impeachment evidence was

not material. As a result, defendant is not entitled to reversal of his convictions and a new trial.

¶ 55                                    B. Right to a Fair Trial

¶ 56        On appeal, defendant next argues he was denied his right to a fair trial due to the

ineffectiveness of his trial counsel and because the trial court erred in denying his motion *in limine*

to exclude evidence of the Flipagram video. We address each argument in turn.

¶ 57                            *1. Ineffective Assistance of Counsel*

¶ 58        On review, a defendant's claim that his counsel was ineffective is judged under the

standard set forth by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984),

requiring a defendant to demonstrate that (1) his attorney's representation fell below an objective

standard of reasonableness and (2) "a reasonable probability exists that, but for counsel's errors,

the result of the proceeding would have been different." *People v. Peterson*, 2017 IL 120331,

¶ 79, 106 N.E.3d 944. "A reasonable probability is a probability sufficient to undermine confidence

in the outcome of the proceeding." (Internal quotation marks omitted.) *Id.* Additionally, "[a] failure

by the defendant to satisfy either prong of the *Strickland* standard precludes a finding of ineffective

assistance of counsel." *Id.*

¶ 59        Defendant first contends his trial counsel were ineffective because they failed to

present Lucas McQueen as a witness at trial. He maintains McQueen could have testified that he

saw the shooter up close and that the shooter had a longer hairstyle than defendant. Defendant

notes that during the trial court's *Krankel* inquiry, one of his attorneys represented that McQueen

was not presented as a witness because they "couldn't physically find [him] to get him served"

and that, although they did have contact with McQueen, they could not "get him to come [to court]

to testify." Defendant argues, however, that the record shows McQueen was served with a

subpoena prior to trial by the State, a fact which defense counsel should have known and which contradicted their asserted basis for not calling him as a witness.

¶ 60    We find that, even assuming defense counsels' performance was deficient, defendant cannot establish the second *Strickland* prong. As discussed, the State presented strong evidence of defendant's guilt, not only through convincing circumstantial evidence but also through eyewitness statements and testimony of individuals who were familiar with defendant and identified him as in possession of a gun before the shooting and as the person firing a gun. For all the reasons discussed above, a reasonable probability does not exist that, but for the failure to call McQueen as a witness, the result of the underlying proceedings would have been different. In other words, in light of the evidence presented at trial, the alleged error by defendant's attorneys does not undermine confidence in the outcome of the trial.

¶ 61    Defendant also argues his attorneys were ineffective because they failed to object when a State's witness violated a pretrial ruling that barred evidence of defendant's MSR status at the time of the underlying offenses. Specifically, at trial, Taylor, defendant's great grandmother, twice testified that defendant had been "paroled" to her home, once when the State asked Taylor if anyone resided with her and once when defendant's counsel asked how long defendant had lived with her. As argued by the State, in both instances, the offending testimony went beyond the questions asked by the parties. The record reflects defendant's attorneys did not object to either response.

¶ 62    To establish deficient performance by counsel, [t]he defendant must overcome the strong presumption that the challenged action or inaction may have been the product of sound trial strategy." *People v. Sturgeon*, 2019 IL App (4th) 170035, ¶ 83, 126 N.E.3d 703. "As a general

- 21 -

rule, trial strategy encompasses decisions such as what matters to object to and when to object." *People v. Pecoraro*, 144 Ill. 2d 1, 13, 578 N.E.2d 942, 947 (1991).

¶ 63          Here, defendant cannot overcome the strong presumption that his counsels' failure to object to Taylor's testimony was the result of sound trial strategy. Although his attorneys had obtained a pretrial ruling to bar evidence of his MSR status, they may have elected not to object to Taylor's brief testimony because, as the State points out, it could have "highlighted" or "drawn attention" to the unwanted statements. Such strategy would not have been unreasonable. Additionally, for the same reasons already discussed, there is no reasonable probability that the result of the proceedings would have been different absent the alleged deficient performance.

¶ 64                              *2. Admission of the Flipagram Video*

¶ 65          Defendant further argues that he was denied a fair trial due to the admission into evidence of the Flipagram video, which showed him in the area of the shooting before it occurred and "pantomiming the shooting of a gun." He contends the video had minimal probative value because his presence at the scene was undisputed and that it was unfairly prejudicial because it suggested that he had a proclivity for gun violence.

¶ 66          Generally, all relevant evidence is admissible. Ill R. Evid. 402 (eff. Jan. 1, 2011). However, "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." Ill. R. Evid. 403 (eff. Jan. 1, 2011). "The admission of evidence is within the sound discretion of a trial court, and a reviewing court will not reverse the trial court absent a showing of an abuse of that discretion." *People v. Becker*, 239 Ill. 2d 215, 234, 940 N.E.2d 1131, 1142 (2010). "An abuse of discretion occurs where the trial court's decision is arbitrary, fanciful or unreasonable [citation] or where no reasonable person would agree with the position

adopted by the trial court." *Id.*

¶ 67      Here, we find no abuse of discretion by the trial court. The Flipagram video was relevant to show defendant's location and appearance on the night of the shooting. The portion of the video depicting defendant consisted of only a few seconds. Further, although it did show him making some type of hand motion toward the camera, it is not clear from the brief video that he was mimicking the shooting of a gun rather than simply pointing at the camera or making a gesture similar to waving, as the trial court determined. Accordingly, we find no abuse of discretion by the court in finding the Flipagram video was not overly prejudicial to defendant and that it could be admitted as evidence.

¶ 68                              *3. Cumulative Error*

¶ 69      Finally, defendant argues that the cumulative effect of his counsels' ineffectiveness and the trial court's erroneous admission of evidence requires reversal. "[W]here errors are not individually considered sufficiently egregious for an appellate court to grant the defendant a new trial, but the errors, nevertheless, create a pervasive pattern of unfair prejudice to the defendant's case, a new trial may be granted on the ground of cumulative error." *People v. Sims*, 2019 IL App (3d) 170417, ¶ 55, 139 N.E.3d 186; see also *People v. Blue*, 189 Ill. 2d 99, 139, 724 N.E.2d 920, 941 (2000) (finding each alleged error in the case cast "doubt upon the reliability of the judicial process" and "[c]umulatively, *** created a pervasive pattern of unfair prejudice to defendant's case").

¶ 70      In this instance, the alleged errors identified by defendant were either not errors or insignificant considering the strong evidence presented against him. Accordingly, none of his claimed errors, either alone or when taken together, entitle him to a new trial. See *People v. Caffey*,

205 Ill. 2d 52, 118, 792 N.E.2d 1163, 1204 (concluding that where "no error occurred at all, or any error that may have occurred did not rise to the level of plain error *** [a] defendant is not entitled to a new trial on the basis of cumulative error"); *People v. Perry*, 224 Ill. 2d 312, 356, 864 N.E.2d 196, 222 (2007) (finding a cumulative-error analysis unnecessary where the defendant's ineffective-assistance-of-counsel claims had been rejected on the basis "that counsel's performance was not deficient or, even if deficient, did not result in prejudice under *Strickland*).

¶ 71                                C. The Trial Court's *Krankel* inquiry

¶ 72        Defendant further argues on appeal that the trial court erred when conducting its *Krankel* inquiry into his *pro se* posttrial claims of ineffective assistance of counsel, asserting he raised allegations showing possible neglect of his case by his attorneys. Again, he asserts "that the identity of the shooter was the core contested issue before the jury" and points out that his counsel failed to call McQueen, who had been served with a subpoena by the State, and was an exculpatory eyewitness. He also suggests that further investigation was warranted into his claims regarding four other potential witnesses—Brown, Holbrook, Alexander-Jordan, and Lopez—because "nothing in the record would have allowed the trial court to resolve [his] and trial counsel's repeated clashes over off-the-record factual matters [involving those individuals'] out-of-court statements."

¶ 73        A *Krankel* inquiry "is triggered when a defendant raises a *pro se* posttrial claim of ineffective assistance of trial counsel." *People v. Ayres*, 2017 IL 120071, ¶ 11, 88 N.E.3d 732. Regarding such claims, the trial court must engage in the following procedure:

        "[T]he trial court should first examine the factual basis of the defendant's claim. If the trial court determines that the claim lacks merit or pertains only to matters of

- 24 -

trial strategy, then the court need not appoint new counsel and may deny the *pro se*

motion. However, if the allegations show possible neglect of the case, new counsel

should be appointed. [Citations.] The new counsel would then represent the

defendant at the hearing on the defendant's *pro se* claim of ineffective assistance."

*People v. Moore*, 207 Ill. 2d 68, 77-78, 797 N.E.2d 631, 637 (2003).

¶ 74      When evaluating the defendant's claims, "some interchange between the trial court

and trial counsel regarding the facts and circumstances surrounding the allegedly ineffective

representation is permissible and usually necessary"; however, "[a] brief discussion between the

trial court and the defendant may be sufficient." *Id.* at 78-79. The court may also "base its

evaluation of the defendant's *pro se* allegations *** on its knowledge of defense counsel's

performance at trial and the insufficiency of the defendant's allegations on their face." *Id.* at 79.

Additionally, "even in preliminary *Krankel* inquiries, a trial court must be able to consider the

merits in their entirety when determining whether to appoint new counsel ***." *People v. Roddis*,

2020 IL 124352, ¶ 61, ____ N.E.3d ___.

¶ 75      Whether the trial court conducted a proper *Krankel* inquiry is subject to *de novo*

review. *People v. Thomas*, 2017 IL App (4th) 150815, ¶ 24, 93 N.E.3d 664. Additionally, "[i]f a

trial court has reached a determination on the merits of a defendant's [*pro se*] ineffective assistance

of counsel claim, we will reverse only if the trial court's action was manifestly erroneous." *People

v. Tolefree*, 2011 IL App (1st) 100689, ¶ 25, 960 N.E.2d 27. " 'Manifest error' is error that is

clearly plain, evident, and indisputable." *Id.*

¶ 76      Here, defendant alleged his trial attorneys were ineffective for failing to present the

testimony of several specific witnesses at trial. As discussed, he challenged their failure to call

McQueen as a witness, alleging McQueen could have provided a description of the shooter's hair that differed from defendant's own appearance. However, the point of a *Krankel* inquiry is to determine whether new counsel should be appointed to further investigate a defendant's *pro se* claims. Because on appeal, defendant has alleged ineffective assistance of counsel based on the failure to call McQueen as a witness and we have determined that, even assuming deficient performance, defendant was not prejudiced, any claim of error with respect to the court's *Krankel* inquiry as to that specific claim has been rendered moot and need not be further considered.

¶ 77    As stated, defendant also maintains that further investigation was warranted into his claims regarding Brown, Holbrook, Alexander-Jordan, and Lopez. Before the trial court, defendant asserted that Alexander-Jordan would have testified that he saw "[H]ispanics" with guns and not defendant and that the remaining three witnesses would have testified that he was not the shooter. Upon inquiry by the trial court, defendant's attorneys discussed their investigation into each potential witness.

¶ 78    Defense counsel represented that they "did not believe [Brown] would be a useful witness" for defendant because, although she initially reported she had been at the party above Evergreen Tobacco and "saw the shooter's eyes," she later admitted to the police that she had lied and had not been present at the party. Defendant's attorneys also determined Holbrook would not be a "beneficial" witness because he had described the shooter as a person wearing all black and a hood, consistent with the State's other evidence. Additionally, although he reported seeing Hispanic individuals with guns, he also stated that he "assumed the shooter and the [Hispanic individuals] were into it with each other." Defense counsel represented they "decided not to call" Alexander-Jordan because he reported to the police that he did not see the shooter or the shooter's

clothing and that he had been talking to someone in a black car in the alley. (One of defendant's theories of defense was that the shooter or shooters had been in a black car located in that same vicinity). Finally, defendant's attorneys represented that Lopez "did not give much [information] to the police *** in his initial interviews" and that they "were never able to get ahold of him." When asked by the trial court if he had any information to "add" regarding his claims as to Lopez or whether he gave or could have given his attorneys any information about how to find Lopez, defendant responded "[n]o."

¶ 79 Based upon its questioning of defendant and defense counsel, the trial court determined that defendant's claims of ineffective assistance were either "unsubstantiated conclusions or were the result of strategic tactical decisions made by counsel." The record reflects the court engaged in the appropriate procedures when inquiring into defendant's *pro se* ineffectiveness claims. Additionally, the record supports its ultimate conclusions, showing defendant's attorneys investigated each potential witness and, as a matter of trial strategy, elected not to call Brown, Holbrook, and Alexander-Jordan. Further, defendant offered no basis for his belief that Lopez would have testified favorably on his behalf and defense counsels' investigation of Lopez indicated he had not previously provided any exculpatory information regarding the shooting. Under these circumstances, possible neglect of the case by defense counsel was not shown and the court's rejection of defendant's *pro se* claims did not amount to manifest error.

¶ 80                                                    D. Sentencing

¶ 81 Finally, on appeal, defendant argues his 60-year sentence for first-degree murder was excessive because the trial court effectively sentenced him to life in prison without giving adequate consideration to his rehabilitative potential. In particular, defendant maintains the court

improperly focused on his age at sentencing, 20, rather than his age at the time of the offense, 18 years and 10 months, causing it to overlook his youth and consequent "significant potential to grow and change, rehabilitating over time." He asks this court to reduce his sentence for first-degree murder to the statutory minimum of 45-years in prison.

¶ 82    Initially, in his reply brief, defendant acknowledges his forfeiture of this issue for failing to first raise it with the trial court. See *People v. Hillier*, 237 Ill. 2d 539, 544, 931 N.E.2d 1184, 1187 (2010) ("[T]o preserve a claim of sentencing error, both a contemporaneous objection and a written postsentencing motion raising the issue are required."). Nevertheless, he asks this court to excuse his forfeiture of the issue and review it for plain error. On review, we may overlook a defendant's forfeiture and reach the merits of his sentencing claim under the plain-error doctrine if he can establish the occurrence of "a clear or obvious error" and "either that (1) the evidence at the sentencing hearing was closely balanced, or (2) the error was so egregious as to deny the defendant a fair sentencing hearing." *Id*. at 545. "Under both prongs of the plain-error doctrine, the defendant has the burden of persuasion." *Id*. Additionally, a plain-error analysis begins "by first determining whether any error occurred at all." *People v. Winchester*, 2016 IL App (4th) 140781, ¶ 69, 66 N.E.3d 601.

¶ 83    Under the Illinois Constitution "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. "In determining an appropriate sentence, a defendant's history, character, and rehabilitative potential, along with the seriousness of the offense, the need to protect society, and the need for deterrence and punishment, must be equally weighed." (Internal quotation marks omitted.) *People v. Lawson*, 2018 IL App (4th) 170105, ¶ 33, 102 N.E.3d 761.

"[A] defendant's rehabilitative potential and other mitigating factors are not entitled to greater weight than the seriousness of the offense." *People v. Shaw*, 351 Ill. App. 3d 1087, 1093-94, 815 N.E.2d 469, 474 (2004).

¶ 84　　　　　On review, "the sentence imposed by the trial court is entitled to great deference and will not be reversed *** absent an abuse of discretion." *People v. McGuire*, 2017 IL App (4th) 150695, ¶ 38, 92 N.E.3d 494. "If the sentence imposed is within the statutory range, it will not be deemed excessive unless it is greatly at variance with the spirit and purpose of the law or is manifestly disproportionate to the nature of the offense." *People v. Kennedy*, 336 Ill. App. 3d 425, 433, 782 N.E.2d 864, 871 (2002).

¶ 85　　　　　Here, defendant was sentenced to 60 years in prison for first-degree murder. 720 ILCS 5/9-1(a)(1) (West 2014). The applicable sentencing range for that offense is 20 to 60 years in prison. 730 ILCS 5/5-4.5-20(a) (West 2014). Additionally, defendant was subject to a 25-year sentencing enhancement because he discharged a firearm that proximately caused the death to another. *Id.* § 5-8-1(a)(1)(d)(iii).

¶ 86　　　　　In this instance, the 60-year sentence imposed by the trial court was well within the applicable statutory range of penalties. Also, contrary to defendant's assertions on appeal, the record reflects the court considered his youth at the time of the offense and mitigating evidence related to the death of defendant's father. Although the court specifically referenced defendant's age at the time of sentencing, 20, rather than at the time of the offense, 18 years and 10 months, it also used the word "teenager" when commenting on the effect of his youth and its attendant characteristics. Moreover, the record shows that the court ultimately accepted defense counsel's argument that defendant's age placed him in the same category as youthful offenders who are

prone to immaturity and likely to have a greater capacity for rehabilitation. However, the court ultimately rejected defendant's arguments related to youth, not because he was 20 years old at sentencing, but because it found those arguments were "undercut" by defendant's prior criminal history and his "behavior *** since his last sentence to prison."

¶ 87 The court's reasoning and the weight it applied to the evidence presented does not reflect an abuse of discretion. Accordingly, we find no error occurred as alleged by defendant on appeal and, thus, no plain error.

¶ 88 III. CONCLUSION

¶ 89 For the reasons stated, we affirm the trial court's judgment.

¶ 90 Affirmed.